IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| JONATHAN J. MACK-MUHAMMAD, | * |
| Plaintiff, | * |
| vs. | *     CASE NO. 4:08-CV-11 (CDL) |
| CAGLE'S INC., BRIAN GRAVES, BRANDON CRYAR, and ANTHONY INGRAM, | * |
| | * |
| Defendants. | * |

O R D E R

Plaintiff, a Muslim, alleges that he was subjected to a hostile work environment based on his religion while employed by Defendant Cagle's, Inc. ("Cagle's"), and that Cagle's ultimately terminated his employment because of his religion.[1] Plaintiff brings his religious discrimination claims against his former employer, Cagle's, and three of its employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  He also asserts a claim under Georgia law for intentional infliction of emotional distress.

---

[1] In his Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination, Plaintiff also alleged that Defendants discriminated against him because of his race and sex. (Ex. A to Compl., EEOC Charge of Discrimination.) In his Complaint, Plaintiff invoked 42 U.S.C. § 1981 as a basis for his claims. (Compl. ¶¶ 1, 15.) However, Plaintiff did not make any factual allegations in his Complaint that he was discriminated against because of his race or sex, and he did not point to any evidence in response to Defendants' summary judgment motion to create a genuine issue of material fact regarding claims of race or sex discrimination. The factual allegations in his Complaint and his summary judgment responses focus exclusively on the religious discrimination claims. For these reasons, to the extent Plaintiff may have intended to assert race or sex discrimination claims, the Court finds he has abandoned any such claims, and they are dismissed. Accordingly, the only claims before the Court relate to Plaintiff's allegations of religious discrimination.

Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 53). For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact. *Id.* at 324. The nonmoving party must "go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324.[2]

---

[2] In his responses to Defendants' summary judgment motion, Plaintiff asserts that hundreds of current and former Cagle's employees will testify on his behalf at trial. However, not a single witness would give a statement before trial because, according to Plaintiff, the current employees are worried that Cagle's will fire them if they give a statement before trial. Plaintiff's proposed witness list includes former Cagle's employees (*see, e.g.,* Pl.'s 1st Resp. to Defs.' Mot. for Summ. J. ¶ 3), but Plaintiff offers no explanation why those witnesses cannot provide a statement at this time. Moreover, Plaintiff does not explain what essential facts any of these witnesses possess that would defeat summary judgment. As the Court previously explained to Plaintiff in its order regarding the significance of Defendants' summary judgment motion, Plaintiff had a responsibility to submit evidence—including witness statements in the form of affidavits—in opposition to Defendants' summary

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

## BACKGROUND

In accordance with Local Rule 56, Defendants attached to their summary judgment motion a statement of material facts to which they contend there is no genuine issue to be tried. Under Local Rule 56, Plaintiff was required to respond to each of Defendants' material facts, and all material facts that are not controverted by Plaintiff

---

judgment motion. (Order Advising Pl. of the Significance of Defs.' Mot. for Summ. J. 2, Oct. 27, 2009.) He has failed to do so, and the Court cannot deny summary judgment based on Plaintiff's vague assertions that witnesses may have something to say on his behalf at trial.

3

are deemed admitted. M.D. Ga. R. 56.[3] Although the Court advised Plaintiff, who is proceeding *pro se*, of the significance of Defendants' summary judgment motion and of Plaintiff's responsibilities under Local Rule 56, Plaintiff did not respond to Defendants' statement of material facts. (Order Advising Pl. of the Significance of Defs.' Mot. for Summ. J. 3, Oct. 27, 2009.) Accordingly, the Court deems Defendants' statement of undisputed facts to be admitted pursuant to Local Rule 56. The Court has reviewed Defendants' citations to the record—including citations to Plaintiff's deposition, testimony in an arbitration proceeding,[4] and the declaration of Brian Graves—and finds that "there is, indeed, no genuine issue of material fact." *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (internal quotation marks omitted). The Court finds it unnecessary to repeat those citations here. Plaintiff did

---

[3]Local Rule 56 provides, in relevant part:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(f) of the Federal Rules of Civil Procedure.

[4]Reliance on the arbitration testimony is permissible under Local Rule 16.2.7, which provides that "testimony given at an arbitration hearing may be used for any purpose otherwise permitted by the Federal Rules of Evidence or the Federal Rules of Civil Procedure."

4

submit several exhibits in response to Defendants' motion for summary judgment, but the "proper course" in applying Local Rule 56 is for the Court "to disregard or ignore evidence relied on by the respondent-but not cited in its response to the movant's statement of undisputed facts-that yields facts contrary to those listed in the movant's statement."[5]  *Id.* at 1268.

Based on its review of Defendants' statement of material facts and citations to the record, the Court finds that the undisputed facts are as follows.

Defendant Cagle's operates a poultry processing plant in Pine Mountain Valley, Georgia. During the relevant timeframe, Defendant Brian Graves was the plant manager, Defendant Brandon Cryar was in sales, and Defendant Anthony Ingram was a shift manager.

Cagle's hired Plaintiff as an hourly chicken packer on October 5, 2006. Cagle's hired Plaintiff through a work program at the LaGrange Transitional Center designed to provide a "fresh start" after incarceration for former inmates like Plaintiff, who had served time in prison for assault and robbery. When he was hired at Cagle's, Plaintiff had no prior experience working in a poultry plant. In his job as a chicken packer, Plaintiff stacked boxes of chicken products on pallets.

---

[5] It does not appear to the Court that Plaintiff's submissions, even if they had been properly authenticated and submitted, yield any facts contrary to those listed in Defendants' statement of material facts, but the Court disregards those submissions in accordance with *Reese*, 527 F.3d at 1268.

5

Around the time Plaintiff was hired as a packer, Cagle's was having difficulty finding qualified candidates for supervisory positions. Cagle's vice president Bob Cryar found out that Plaintiff had a college degree and suggested to Graves that Plaintiff be moved into a supervisory position to "see what he could do." Accordingly, two weeks after Cagle's hired Plaintiff as a packer, Graves and Bob Cryar promoted Plaintiff to the position of superintendent. Plaintiff is Muslim, and Graves and Bob Cryar knew that Plaintiff was Muslim when they promoted him to superintendent.

As a superintendent, Plaintiff was responsible for supervising all of the production lines on his shift, which encompassed several hundred employees. Plaintiff's shift was the second shift, during which all of the poultry killed during the first shift was packed. Customers placed orders for quantities of chickens of a certain size, and the chickens had to be packaged based on the customers' orders. At the beginning of the second shift, the supervisors met to go over the "run schedule" and discuss customer order priorities, and the superintendent's job was to manage the flow of birds to meet customer requirements. Those chickens that did not get packed during the second shift had to be placed in vats, which resulted in a loss of moisture and reduced sellable pounds of chickens—which translated into lost profits—so the goal was to pack all of the chickens during the second shift and store no chickens in vats.

The shift manager for the second shift, Anthony Ingram, was assigned to train and supervise Plaintiff in his new superintendent job.[6] Plaintiff contends that he did a great job as superintendent at Cagle's. However, almost immediately, Ingram and others saw problems with Plaintiff's work. Ingram realized that Plaintiff had no poultry processing experience or knowledge about the business. Ingram also believed that Plaintiff did not follow instructions well and was unable to manage the lines under his supervision to meet customer orders and to minimize reduced yield due to vat storage. Cagle's sales director Brandon Cryar told Plaintiff that he needed to write down the details of the orders for the shift so that he could remember the priorities for each day, but Plaintiff refused and on at least one occasion rolled his eyes at Brandon Cryar when he told Plaintiff to take notes. During Plaintiff's tenure as superintendent, a customer rejected a large shipment of product because of improper labeling; this mistake—which Defendants attribute to Plaintiff's inattention to detail regarding customer orders—resulted in a loss of several thousand dollars.

In addition, while Plaintiff was superintendent, the second-shift packers were not keeping up with the supply of chickens processed during the first shift, and the plant was carrying more than thirty vats of chicken per night, which resulted in loss of

---

[6]Ingram had worked up the ranks at Cagle's; he was at Cagle's for at least eight years before he was promoted to superintendent, and he was promoted to shift manager after several years as superintendent.

moisture and reduced yield. Ingram counseled Plaintiff on these performance issues, and tension developed between the two.[7] Plaintiff believed that Ingram was just jealous of Plaintiff's quick promotion. Graves met with both Plaintiff and Ingram to counsel them about the friction between them, and he told Plaintiff that he needed to stop making decisions without Ingram's input. According to Plaintiff, any conflict between him and Ingram did not affect him.

Finally, Ingram, Graves, and the Cagle's human resources manager found that Plaintiff did not communicate adequately with the line workers regarding unscheduled overtime as he was required to do under the line workers' collective bargaining agreement, and that he lied about it to human resources. Specifically, Plaintiff was required to give workers at least one hour's notice of unscheduled overtime. Though Plaintiff told the human resources manager that he had given proper notice, several line workers complained to human resources that they did not receive adequate notice. The human resources manager had to meet with Plaintiff on several occasions to counsel him on this issue.

While Plaintiff was employed at Cagle's, there were several occasions when Defendants served pork at company functions, and Plaintiff claims that this was discriminatory. Plaintiff does not eat pork because of his religion. On one occasion, Cagle's had a

---

[7] Plaintiff alleged in his Complaint that Ingram "antagonized" Plaintiff almost daily by calling him "Mr. Bin Laden," "Osama," and "the Muhammad Man" over the company radio and intercom. (Compl. ¶ 28.)

8

party for all the employees and brought in food from Country's Barbecue. Plaintiff asked his supervisor if non-pork items could be served at the party, but the menu was predominately pork barbecue and other foods containing pork; only a few non-pork items were served. On another occasion, Plaintiff's managers brought in pizza for a meeting, and all of the pizzas had some sort of pork topping. At the next meeting where pizza was served, the managers did order a cheese pizza for Plaintiff.

In early 2007, the plant was losing a quarter of a million dollars per week, and Bob Cryar, who along with Graves decided to promote Plaintiff to superintendent, was fired. About a week after Bob Cryar's termination, Graves decided to terminate Plaintiff's employment. Plaintiff was fired on March 5, 2007. Graves believed that Plaintiff had failed to prove himself in the superintendent position because Plaintiff would not take direction from others, he was not effectively managing the lines under his supervision, and his credibility had been diminished due to the incidents regarding unscheduled overtime. In hindsight, Graves determined that it had been a mistake to promote Plaintiff so quickly, and Graves felt that the new management that would replace Bob Cryar should be able to put qualified people into supervisory roles.

After Graves terminated Plaintiff, Plaintiff wrote a letter to the president of Cagle's, asking the president to review his termination and to reinstate him. In that three-page letter,

Plaintiff did not allege that he had been subjected to any type of harassment or discrimination.  Rather, he opined that he had been terminated because he caught Ingram and others stealing from the company and because the supervisors were jealous of his capabilities.

## DISCUSSION

Plaintiff claims that Defendants subjected him to a hostile work environment and terminated him because of his religion, in violation of Title VII.[8]  (*See generally* Compl.)  Plaintiff also seeks to hold Defendants liable under Georgia law for intentional infliction of emotional distress.  The Court addresses each of these claims in turn below.

## I.   **Title VII Claims**

Preliminarily, the Court notes that Plaintiff attempts to make Title VII claims against Graves, Brandon Cryar, and Ingram individually.  Those claims fail because none of those individuals

---

[8]Plaintiff also contends that he was terminated because he asked for a raise which he alleges was promised to him. (Pl.'s 2d Resp. to Defs.' Mot. for Summ. J. ¶ 6.)  To the extent that Plaintiff attempts to state a retaliation claim based on this allegation, the retaliation claim fails because there is no evidence that Plaintiff engaged in statutorily protected activity by protesting an unlawful employment practice when he asked for the raise.  Plaintiff also appears to argue that he was terminated in retaliation for his complaints that his supervisors and coworkers harassed him because of his religion. (Compl. ¶ 55; *see also* Pl.'s 1st Resp. to Defs.' Mot. for Summ. J. ¶ 2.)  However, this claim fails because even if Plaintiff engaged in statutorily protected activity, he points to no evidence that his termination was causally related to the protected activity—such as evidence of a very close temporal proximity between the protected activity and his termination. Furthermore, even if Plaintiff had established a prima facie case of retaliation, his claim would still fail.  As discussed below, Cagle's proffered a legitimate nondiscriminatory reason for Plaintiff's termination, and Plaintiff pointed to no evidence to show that the proffered reason was pretextual.

10

was Plaintiff's employer. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) (Title VII grants relief "against the *employer*, not individual employees whose actions would constitute a violation of the Act." (internal quotation marks omitted)). Therefore, Graves, Cryar, and Ingram are entitled to summary judgment as to Plaintiff's Title VII claims. Accordingly, the only remaining Title VII Defendant is Plaintiff's employer, Cagle's.

>    A.   Hostile Work Environment Claim

Plaintiff alleges that his supervisors subjected him to a hostile work environment because of his religion. Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). To establish a claim of religious discrimination under Title VII due to hostile work environment harassment caused by a supervisor, an employee must produce evidence showing that

> (1) he belongs to a protected class, (2) he was subject to unwelcome harassment, (3) the harassment was based on his religion, (4) the harassment was sufficiently severe and pervasive to alter the terms of his employment and create an abusive working environment, and (5) there exists a basis for holding the employer liable.

*Richardson v. Dougherty County, Ga.*, 185 F. App'x 785, 790-91 (11th Cir. 2006) (per curiam); *see also Corbitt v. Home Depot U.S.A., Inc.*,

11

No. 08-12199, 2009 WL 4432654, at \*10 (11th Cir. Dec. 4, 2009) (listing elements of sexual harassment hostile work environment).

There is no real dispute for purposes of summary judgment that Plaintiff belonged to a protected class or that he was subjected to some harassment based upon his religion. The key question is whether the harassment was sufficiently severe and pervasive to alter the terms of Plaintiff's employment and create an abusive working environment. The Court concludes that it was not. Title VII is not a workplace "civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). "Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000). To determine whether harassment is objectively severe and pervasive, the courts "consider 'the frequency of the conduct,' 'the severity of the conduct,' 'whether the conduct is physically threatening or humiliating, or a mere offensive utterance,' and 'whether the conduct unreasonably interferes with the

employee's job performance.'" *Id.* (quoting *Mendoza*, 195 F.3d at 1246.)

Plaintiff contends that he was subjected to religious harassment because (1) Ingram often called Plaintiff "Mr. Bin Laden," "Osama," and "the Muhammad Man" over the company radio and intercom; (2) on several occasions, Plaintiff's supervisors provided the team with a meal that included pork but failed to provide sufficient non-pork alternatives; and (3) Plaintiff's supervisors and other employees asked Plaintiff about his religion and made comments about Plaintiff's religious dietary restrictions. Though these allegations demonstrate that Plaintiff's supervisors and co-workers may have been insensitive and rude, the allegations do not rise to the level of severe and pervasive harassment. The conduct was not threatening and generally consisted of offensive utterances. Moreover, Plaintiff asserted that he did a great job at Cagle's and that the alleged harassment did not affect him in performing his job. For these reasons, the Court concludes that the alleged harassment was neither objectively nor subjectively severe and pervasive. Accordingly, the Court grants summary judgment in favor of Cagle's on Plaintiff's hostile work environment claim.

### B.   Termination Claim

In addition to his hostile work environment claim, Plaintiff alleges that Cagle's terminated him because of his religion. Plaintiff has not offered any direct evidence that he was terminated

13

because of his religion. Therefore, the Court will examine his claims under the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If the employer meets this burden of production, the presumption raised by the prima facie case is rebutted, and to avoid summary judgment the plaintiff must come forward with evidence sufficient to create a "genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons" is pretext for discrimination. *Chapman*, 229 F.3d at 1024 (emphasis added); *accord Crawford*, 482 F.3d at 1308.

To establish a prima facie case of improper termination, Plaintiff must present evidence sufficient to prove that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class."

14

*Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). Cagle's concedes for purposes of summary judgment that Plaintiff was a member of a protected class and that he suffered an adverse employment action. Cagle's argues, however, that Plaintiff was not qualified for the superintendent position and that he did not show that he was replaced by a non-Muslim. Cagle's also asserts that even if Plaintiff established a prima facie case of discrimination, he has not presented sufficient evidence to show that the proffered reason for his termination—poor performance—was pretext for discrimination.

While Plaintiff did not establish that he was replaced by a non-Muslim, Plaintiff could also establish a prima facie case by showing that he was treated less favorably than a similarly-situated individual outside his protected class—in other words, a non-Muslim person with similar performance issues. Since Plaintiff claims that he did not have any performance issues and that he was qualified to be superintendent, the question whether he has established a prima facie case of discrimination is intertwined with the issue of whether the reason for his termination was pretextual. To establish that the proffered reason is pretext for discrimination, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Rioux*, 520 F.3d at 1275 (internal quotation marks omitted). As discussed above, the record strongly

15

supports Defendants' conclusion that Plaintiff did a poor job as superintendent and that he did not improve because he ignored feedback from his supervisors. Plaintiff argues, however, that he was doing a "great job" because he was, on average, completing 85-90% of his work daily. (Pl.'s 2d Resp. to Defs.' Mot. for Summ. J. ¶ 1.) Even if Plaintiff had pointed to sufficient evidence to support this assertion, he pointed to no evidence that an average completion rate of 85-90% was acceptable or that other superintendents with similar productivity were retained. In short, Plaintiff pointed to no evidence to show that his performance as superintendent was satisfactory or that similarly situated non-Muslim employees were treated more favorably. Thus, there is no evidence from which a reasonable factfinder could conclude that the proffered reason for Plaintiff's termination was pretext for discrimination. Therefore, Cagle's is entitled to summary judgment on Plaintiff's termination claim.

## II.   Intentional Infliction of Emotional Distress Claim

In addition to his Title VII claims, Plaintiff asserts claims against Defendants for intentional infliction of emotional distress. To prevail on his intentional infliction of emotional distress claim, Plaintiff must show that (1) Defendants' "conduct was intentional or reckless;" (2) Defendants' "conduct was extreme and outrageous;" (3) "a causal connection existed between the wrongful conduct and the emotional distress;" and (4) "the emotional harm was severe." *Abdul-*

16

*Malik v. AirTran Airways, Inc.*, 297 Ga. App. 852, 856, 678 S.E.2d 555, 558-59 (2009). Plaintiff has not pointed to any evidence to show that Defendants engaged in extreme and outrageous conduct or that he suffered severe emotional harm. "Extreme and outrageous conduct is that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*, 678 S.E.2d at 559 (internal quotation marks omitted). While there is some evidence that Plaintiff's supervisors were insensitive and rude, there is no evidence that they engaged in conduct that goes beyond all possible bounds of decency. Even if such evidence existed, Plaintiff has pointed to no evidence that he suffered severe emotional distress. Emotional distress is severe only if no reasonable person could be expected to endure it. *Id.* at 858, 678 S.E.2d at 560. Plaintiff points to no evidence that he experienced any emotional distress, much less distress so severe that no reasonable person could be expected to endure it. Plaintiff did not even address this issue in his briefs.[9] Accordingly, the Court grants Defendants' summary judgment motion as to Plaintiff's intentional infliction of emotional distress claim.

---

[9] Plaintiff did state in one of his briefs that he has been under "great duress" and has been in and out of the hospital, but he produced no evidence that these issues were the result of Defendants' conduct. (*See* Pl.'s 1st Resp. to Defs.' Mot. for Summ. J. ¶ 4.)

17

CONCLUSION

For the previous reasons, the Court grants Defendants' Motion for Summary Judgment (Doc. 53).

IT IS SO ORDERED, this 4th day of January, 2010.

                                    S/Clay D. Land
                                         CLAY D. LAND
                          UNITED STATES DISTRICT JUDGE